USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ____1/5/2026____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JESSIE FERREIRA

                    Plaintiff,

    -against-

DAVID DOSIN, POLICE CHIEF, sued in his individual capacity, VILLAGE OF HASTINGS- ON-HUDSON,

                    Defendants.

**23 CV 10336 (NSR)**

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

Plaintiff Jessie Ferreira ("Ferreira" or "Plaintiff") commenced this action on November 27, 2023 (ECF No. 1, Complaint ("Compl.")), alleging violations of her Fourteenth Amendment equal protection rights under 42 U.S.C. § 1983 against Defendant David Dosin, Chief of Police of the Village of Hastings-on-Hudson, and Defendant the Village of Hastings-on-Hudson (collectively, "Defendants").

Presently before the Court is Defendants' Motion to Dismiss Plaintiff's First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). For the following reasons, Defendants' Motion to Dismiss is GRANTED.

## BACKGROUND

The following facts are derived from the Complaint and are taken as true and constructed in the light most favorable to the Plaintiff at this stage.

### i.    Failure to Support Plaintiff as A Supervisory Officer

In August 2019, the Village Board appointed Defendant Dosin as Chief of Police, replacing Chief Visalli, who had been terminated in part for his treatment of Plaintiff. (FAC ¶ 44.) Defendant Dosin had worked for the Police Department since 1990, serving as an officer, a sergeant from 1998 to 2009, and a lieutenant from February 2009 until his promotion to Chief. (*Id.* ¶ 45.) According to

the complaint, Defendant Dosin was thoroughly familiar with the Department's sexist and racist culture and remained loyal to former Chief Visalli. (*Id* ¶ 45.) Through a lateral transfer from the Village of Pelham Manor, the Village hired Ed Fattorini as a police officer effective April 12, 2021. (*Id* ¶ 46.) At that time, the Department consisted of eleven police officers supervised by four sergeants, one lieutenant, and the Chief. (*Id* ¶ 47.)

In January 2021, while four months pregnant, Plaintiff requested that Chief Dosin switch her assignment with Sergeant ("Sgt") Thomas O'Sullivan, who was then assigned as desk sergeant. (FAC ¶ 48) Plaintiff made this request because other male sergeants with injuries had been accommodated with light-duty desk assignments, and Chief Dosin had discretion to make such assignments. (*Id* ¶ 49) Sgt. O'Sullivan refused to switch assignments, claiming it would cause him undue hardship, and complained repeatedly that Chief Dosin was giving Plaintiff preferential treatment because she was pregnant. (*Id.* ¶ 50) Sgt. O'Sullivan made no similar complaints when male officers—including Officer DeBlasio—received light-duty accommodations. (*Id.* ¶ 51) O'Sullivan alleged that accommodating Plaintiff constituted discrimination against him as a male officer and he filed an Equal Employment Opportunity Commission ("EEOC") charge claiming gender discrimination. (FAC ¶ 52)

Despite arranging other accommodations for Plaintiff, Sgt. O'Sullivan printed case law supporting his claim, displayed it throughout the Department, and harassed Plaintiff whenever he encountered her at the station. (FAC ¶ 53.) Chief Dosin took no steps to stop this conduct, which was directed at Plaintiff and made her feel uncomfortable. (*Id.* ¶ 54.) The complaint characterizes this failure to intervene—despite intentional taunting by another sergeant—as reflective of Plaintiff's devaluation based on gender. (*Id.* ¶ 55.)

Plaintiff returned to work from maternity leave on September 28, 2021. (FAC ¶ 56.) On her first day back, the Department received a call regarding a suspicious vehicle. (*Id.* ¶ 57.) Police Officer

Chris Sorano was dispatched and provided Plaintiff with the vehicle's VIN number. (*Id.*¶ 58.) During that call, Sorano stated to a civilian, "Jessie Ferreira, the Sergeant nobody likes," and later referenced "hating" Plaintiff. (*Id* ¶ 59.) Plaintiff reported the incident to her Lieutenant and then to Chief Dosin. (*Id.* ¶ 60.) Chief Dosin told Plaintiff that he could not say what, if anything, he would do in response. (*Id.* ¶ 61.) Officer Sorano faced no disciplinary action, despite the conduct violating Department rules and constituting insubordination. (*Id.* ¶¶ 62–63.) After the incident, Sorano was promoted to the rank of sergeant. (*Id* ¶ 64.)

After returning from maternity leave, Plaintiff continued breastfeeding her infant. (FAC ¶ 65.) She was unable to pump in the space provided because other officers removed the key to the room, which was a public bathroom. (*Id.* ¶ 66.) Plaintiff went twelve hours without pumping, developed mastitis, and was treated with antibiotics following a hospital visit. (*Id.* ¶ 67.) Plaintiff reported the issue to Chief Dosin, who took no action to address it. (*Id.* ¶ 68.)

Shortly thereafter, Sgt. O'Sullivan broke the lock on Plaintiff's locker, stating that it prevented him from accessing his own locker. (FAC ¶ 69.) He did not ask Plaintiff for assistance beforehand, and the conduct allegedly violated Department regulations and standards of conduct. (*Id.* ¶ 69.) When the locker had previously been assigned to Sgt. DeBlasio, Sgt. O'Sullivan had not attempted to break into it. (*Id.* ¶ 70.) Plaintiff became concerned that her pumping equipment had been tampered with and discovered that a component was missing, leading her to stop using the supplies. (*Id.* ¶ 71.) No disciplinary action was taken, and Plaintiff's locker remains unsecured. (*Id.* ¶ 72.)

On December 5, 2021, a community member contacted the Department's hotline and reported that her daughter had expressed suicidal intent. (FAC ¶ 73.) Officers Fattorini and Wilber Maldonado located the daughter and cleared the incident, stating she was fine. (*Id.* ¶ 74.) Plaintiff questioned the resolution because the mother had reported suicidal intent earlier that evening. (*Id.* ¶ 75.) Plaintiff contacted EMS to transport the individual for evaluation. (*Id.* ¶ 76.) Officer Fattorini refused

Plaintiff's direct order to accompany the individual. (*Id.* ¶ 77.) Plaintiff met with Officer Fattorini to address the issue, but shortly after the meeting began, he walked out. (*Id.* ¶¶ 78–79.) When ordered to return, Officer Fattorini stated, "I don't have to talk to you. I will listen, but I am not going to answer your questions. I only have to talk to the lieutenant." (*Id.* ¶ 80.) Plaintiff reported the conduct, but Chief Dosin imposed no discipline. (*Id.* ¶ 81.) Consistent with this pattern, although department policy required sergeants to approve vacation selections submitted by their subordinates, officers were permitted—only with respect to Plaintiff—to bypass her and submit requests directly to lieutenants. (*Id.* ¶ 82.)

In March 2022, Chief Dosin assigned Plaintiff to review all domestic incident reports. (FAC ¶ 83.) Plaintiff observed that reports were poorly prepared and that officers often mishandled domestic incidents, most frequently involving female complainants and male partners. (*Id.* ¶ 84.) On November 27, 2022, Plaintiff emailed the Chief and a lieutenant requesting assistance. (*Id.* ¶ 85.) Chief Dosin responded by directing Plaintiff to proceed through the chain of command. (*Id.* ¶ 86.)  The complaint states that this response deviated from the Chief's open-door policy and was not imposed on male sergeants. (*Id.* ¶ 87.) Specifically, Plaintiff alleges that on December 10, 2024, Sgt. Minor met directly with the Chief to discuss domestic violence matters; that earlier the same day, Patrol Officer ("P.O") King entered the Chief's office to discuss accreditation standards; that the prior day, P.O. Rojas met with the Chief regarding rifle qualifications; and that on September 27, 2023, the Chief met directly with Sgt. O'Sullivan to discuss shift swaps. (*Id.* ¶ 88.)

On December 11–12, 2022, Plaintiff responded to a matter involving a detainee being remanded to jail. (FAC ¶ 89.) While occupied, Plaintiff instructed Officer Fattorini to stand by. (Id. ¶ 90.) Seconds later, Plaintiff replied, "go ahead", and Officer Fattorini replied, "oh nothing." (*Id.* ¶ 91.) Believing there was no emergency, Plaintiff resumed her prior task. (*Id.* ¶ 92.) The following day, Patrol Officer Fattorini sent an email to his lieutenant asserting that he needed to address an

4

officer-safety concern, claiming that Plaintiff had instructed him to stand by in what he characterized as a potentially dangerous situation. (*Id.* ¶ 93.) Plaintiff explained that officers are routinely instructed that they may disregard a standby order in the event of an emergency, and that the purpose of her directive was to maintain clarity regarding urgency—an explanation that Officer Fattorini understood but failed to convey. (*Id.* ¶ 94.) She further alleges that Officer Fattorini's email reflected continued disrespectful and sexist conduct, intended to undermine her authority, particularly given that male supervisors regularly issued similar standby directives without any officer asserting that such instructions jeopardized officer safety. (*Id.* ¶ 95.) Nevertheless, after Plaintiff reported Officer Fattorini's conduct, the Chief failed to intervene or otherwise curb his continued disrespect toward Plaintiff, the only female supervisor in the department. (Id. ¶ 96.)

On December 29–30, 2022, a woman contacted the Department stating that someone was trying to kill her. (FAC ¶ 97.) Plaintiff dispatched Officers Simmons and Fattorini. (*Id.* ¶ 98.) The officers cleared the call after the alleged assailant stated the woman might be bipolar. (*Id.* ¶ 99.) No victim statement was obtained, and the report relied solely on information from the alleged perpetrator. (*Id.* ¶ 100.) Plaintiff reported the deviation, but her lieutenant declined to support her and instructed her to address it herself. (*Id.* ¶ 101.)

On September 22, 2020, Plaintiff discovered email correspondence dated March 15, 2019, between former Chief Visalli and then-Lieutenant ("Lt.") Brecker, in which Visalli requested a photograph of Plaintiff and Lt. Brecker sent a photo depicting her in tight-fitting clothing. (FAC ¶ 102.) Plaintiff shared the emails with the Village Manager and her lieutenant but received no response. (*Id.* ¶ 103.)

In June 2023, Officers Barry and Simmons engaged in a vehicle pursuit that violated Department policy. (FAC ¶ 104.) During the pursuit, a child was nearly struck. (*Id.* ¶ 105.) The pursuit continued out of jurisdiction, and the suspect jumped into the Hudson River. (*Id.* ¶ 106.) Plaintiff

reported the incident and advised Chief Dosin that the officers violated policy by pursuing a vehicle for tinted windows and failing to document the dangerous driving involved. (*Id.* ¶ 107.) Plaintiff advised Chief Dosin that "the dangers posed by this pursuit [to the community and suspect] far outweighed the threat this subject posed to the community." (*Id.* ¶ 108.) Chief Dosin responded by praising the officers and accusing Plaintiff of trying to get them in trouble. (*Id.* ¶ 109.)

The complaint states that the repeated and public failure to support Plaintiff in her interactions with male subordinates impaired her ability to perform her supervisory duties. (FAC ¶ 110.) This conduct allegedly deviated from how Chief Dosin supported male sergeants and from Department policy emphasizing respect for supervisory authority. (*Id.* ¶ 111.) Plaintiff claims this conduct was intentional and rooted in Plaintiff's devaluation as a female supervisor. (*Id.* ¶ 112.) Plaintiff was the sole female supervisor in the Department, while male sergeants and the lieutenant were accorded greater respect. (*Id.* ¶ 113.) Plaintiff experienced stress, anxiety, and humiliation as a result. (*Id.* ¶ 114.)

### ii.    Failure to Promote Plaintiff to the Rank of Lieutenant

During the summer of 2023, Plaintiff sought promotion to the rank of lieutenant. (FAC ¶ 115.) She took the civil service examination and was reachable for the position. (*Id.* ¶ 116.) Plaintiff alleges she was the best-qualified candidate for the position, which, according to civil service specifications, required attention to detail, the ability to write and review reports, knowledge of departmental policies, and the ability to lead. (*Id.* ¶ 117.) The Village's job description for lieutenant included oversight of departmental divisions, maintenance of manuals and orders, supervision of headquarters operations, and service as patrol division commander. (*Id.* ¶ 118.) Plaintiff alleges that, during her years in the Department, she demonstrated superior competency in each of these regards. (*Id.* ¶ 119.)

Plaintiff interviewed for the position on August 31, 2023, with Defendant Dosin, the Village Manager, the Mayor, and members of the Village Board of Trustees. (FAC ¶ 120.) Plaintiff alleges

6

that she answered each and every question and that the interview went well, though Defendant Chief rolled his eyes on several occasions during the interview. (*Id.* ¶ 121.) Plaintiff did not receive the promotion she sought, and Robert Gagliardi, a male who is not of Hispanic descent, did. (*Id.* ¶ 122.) Gagliardi has served in the Department since 2010, was promoted to detective sergeant in April 2020, and he had the same amount of time in that position as did Plaintiff. (*Id.* ¶ 123.) Plaintiff alleges that the Village did not appoint the person with the highest civil service score to the position, which she contends demonstrates that the score could not have been the principal criterion governing the selection. (*Id.* ¶ 124.)

Plaintiff's qualifications for lieutenant included multilingual fluency, higher education in criminal justice, supervisory and training experience, interagency work, and leadership in domestic-violence response and policy development. (FAC ¶ 125.) Over the course of her career, Plaintiff also received multiple awards and commendations recognizing her performance, professionalism, and service to the community, including recognition for lifesaving actions, investigative work, and community engagement. (*Id.* ¶ 126.) Plaintiff contends her qualifications exceeded those of the male officer promoted in her stead. (FAC ¶ 127.)

The promoted officer, Lieutenant Gagliardi, worked in the Village's Department of Public Works before becoming a police officer, and the same was true of the other reachable candidate, Mr. O'Sullivan. (*Id.* ¶ 128.) Plaintiff alleges that both candidates only speak English and neither of them have prior experience working in different jobs where they could have gained the experience needed for the lieutenant position. (*Id.* ¶¶ 129-130.) Both candidates were allegedly hired by the Police Department due to their family links to the Village. (*Id.* ¶ 131.) Plaintiff alleges that O'Sullivan was hired by his father, who at the time was the acting Chief of Police for the Hastings Police Department and Gagliardi was also hired due to his family's connections to the Village. (*Id.* ¶¶ 132-133.)

7

According to Plaintiff, Defendant Dosin started grooming Gagliardi to become lieutenant several years ago, and O'Sullivan likewise received privileges while working for the Police Department, including the chance to become a SWAT member. (*Id.* ¶ 134.) Before any promotion decision was announced—and before Plaintiff even interviewed for the position—Gagliardi moved into the lieutenant's office and was carrying on as if he had already been awarded the promotion. (*Id.* ¶ 135.) Acting Chief O'Sullivan Sr. did not make arrangements to send anyone other than his son to the SWAT tryouts, for which the Village had one available spot. (*Id.* ¶ 136.) Defendant Dosin arranged for another police officer to attend detective school before selecting Detective Gagliardi for the lieutenant position, which Plaintiff contends signaled that the position would soon be available. (*Id.* ¶ 137.)

Plaintiff contends that the failure to promote her to lieutenant despite her superior qualifications reflects intentional discriminatory treatment by Defendant Dosin, who is allegedly deeply immersed in a police culture that has undervalued females and infrequently represented them in the Department's ranks. (FAC ¶ 138.)

### iii.    Post-Filing Acts of Retaliation Against Plaintiff

Plaintiff filed this action in December 2023. (FAC ¶ 139.) She asserts that Defendants thereafter engaged in multiple retaliatory acts. (*Id.* ¶ 140.)

Plaintiff was the only supervising officer who completed required training virtually, because the relevant domestic-violence training was available only in that format. (FAC ¶¶ 141–42.) Prior to filing suit, she received overtime compensation for completing this training. (*Id.* ¶ 143.) Within two months of the filing, Defendant Dosin changed Department policy to prohibit overtime compensation for officers who completed training virtually. (*Id.* ¶ 144.) The policy affected only Plaintiff and was allegedly implemented to punish her for filing suit. (*Id.* ¶ 145.)

In the summer of 2024, Defendant Dosin proposed altering the manner in which supervisory shifts were bid. (FAC ¶ 146.) Since at least 2018, the collective bargaining agreement required ranking officers to bid shifts based on seniority. (*Id.* ¶ 147.) When Plaintiff was the most junior sergeant, she was assigned the midnight shift, which was widely regarded as the least desirable. (*Id.* ¶ 148.) She worked that shift for several years due to her seniority status. (*Id.* ¶ 149.)

In 2023 and 2024, Plaintiff was no longer among the two least senior sergeants and was assigned to the day shift. (FAC ¶ 150.) In the fall of 2024, Defendant Dosin sought to eliminate seniority-based shift assignments by negotiating a modification to the collective bargaining agreement. (*Id.* ¶ 151.) The PBA and defendant Dosin agreed to this change but only after they also agreed that two of the four sergeants would not switch shifts. (*Id.* ¶ 152.) As a result, one sergeant working days and one sergeant working nights remained unchanged. (*Id.* ¶ 153.) Of the four sergeants, Plaintiff was the only sergeant forced to change shifts against her wishes and in derogation of seniority. (*Id.* ¶ 154.) Defendant Dosin pursued this change knowing that night shifts caused Plaintiff stress and disrupted her personal life and did so to retaliate against her for filing this lawsuit. (*Id.* ¶ 155.)

Based on the foregoing allegations, Plaintiff asserts claims under 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment. (FAC ¶¶ 156–159.)

## A.  Procedural History

Plaintiff commenced this action on November 27, 2023, by filing a Complaint asserting claims under 42 U.S.C. § 1983 for alleged violations of the Equal Protection Clause. (See generally Compl.) Defendants moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 15 & 17.) Plaintiff opposed the motion (ECF No. 21), and Defendants submitted a reply. (ECF No. 18.)

By Opinion and Order dated November 26, 2024, the Court granted Defendants' motion and dismissed the Complaint without prejudice. (ECF No. 22, Opinion & Order.) The Court concluded that Plaintiff failed to plausibly allege (1) that she was denied a promotion under circumstances giving rise to an inference of discrimination, and (2) that she was subjected to disparate treatment as a supervisor because she did not identify similarly situated male supervisors who received more favorable treatment. (See generally id.)

Plaintiff filed the First Amended Complaint on December 23, 2024. (FAC, ECF No. 23.) Defendants again moved to dismiss and submitted a memorandum of law in support. (Dfts. Mot. & Mem., ECF Nos. 28 & 30.) Plaintiff opposed the motion (Pltf. Opp., ECF No. 34), and Defendants filed a reply. (Dfts. Reply, ECF No. 31.)

## LEGAL STANDARD

### A.  Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor*, 220

10

F.3d 81, 88 (2d Cir. 2000) (internal citations omitted). The critical inquiry is whether the Plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[] the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### B. Section 1983

Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see also Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). To assert a claim under Section 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*, No. 09-CV-5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. 2013); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). Therefore, a Section 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. *See Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999) (Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution").

In order for a defendant in a Section 1983 action to be held liable, the plaintiff must demonstrate the defendant was personally involved in the alleged constitutional violations. *Whitton v. Williams*, 90 F. Supp. 2d 420, 427 (S.D.N.Y. 2000). Personal involvement is defined as "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Important context is that a defendant "in a § 1983 action is not liable simply on the basis of holding a high position of authority." *Dawson v. Cnty. of Westchester*, 351 F. Supp. 2d 176, 196 (S.D.N.Y. 2004). Additionally, "[p]leadings pursuant to § 1983 must contain 'more than mere conclusory allegations.'" *Richard v. Fischer*, 38 F. Supp. 3d 340, 351 (W.D.N.Y. 2014) (quoting *Salahuddin v. Cuomo,* 861 F.2d 40, 43 (2d Cir.1988)).

## DISCUSSION

Plaintiff brings claims pursuant to Section 1983, alleging Fourteenth Amendment violations. The Court addresses them in turn.

### A.  Section 1983 claims against Defendant Dosin – Failure to Promote

Plaintiff fails to plausibly allege that the decision not to promote her to lieutenant was motivated by gender discrimination.

In order to state a Section 1983 claim for violation of the Fourteenth Amendment right to equal protection, a Plaintiff must allege that "(1) [they], compared with others similarly situated, w[ere] selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 610 (2d Cir. 1980). To effectuate a Section 1983 claim for employment discrimination based on failure to promote, a plaintiff must show: "(1) she belonged to a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) that the adverse employment action

12

occurred under circumstances giving rise to an inference of discriminatory intent." *Bunten v. Donat*, No. 21-CV-04588, 2024 WL 1640054, at \*1 (S.D.N.Y. 2024). In order "[f]or a disparity in qualifications to raise an inference of discrimination, 'the disparity should be enough that a reasonable employer would have found the plaintiff to be significantly better qualified for the job.'" *Id.* (quoting *United States v. City of New York*, 713 F. Supp. 2d 300, 320 (S.D.N.Y. 2010)).

Despite expanding the description of her own credentials, Plaintiff alleges no facts that would permit a meaningful comparison to the qualifications of the promoted candidate, Gagliardi. The FAC details Plaintiff's extensive law enforcement experience, including service as the Department's Domestic Violence Liaison, involvement in training and policy development, multilingual fluency, academic degrees, and numerous commendations. (FAC ¶¶ 117–126.) These additional allegations, however, do not remedy the pleading deficiency previously identified by the Court. Ferreira offers no factual detail regarding Gagliardi's education, training, awards, performance history, or career accomplishments. Instead, she relies primarily on conclusory assertions that her qualifications "dwarf" those of the selected candidate and that she was "the best qualified" applicant. (FAC ¶¶ 117, 127); *Mercado v. City of New York*, No. 13 CIV. 389, 2014 WL 627035, at \*2 (S.D.N.Y. 2014) (holding that allegations that other detectives were "less qualified" were "conclusory and unsupported by any facts in the complaint"). Without such comparative detail, Plaintiff's conclusory assertions of superior qualifications cannot support an inference of discrimination, requiring dismissal of the claim. *See Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000) ("plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself"); *Fleurentin v. New York City Health & Hosps. Corp.,* No. 18CV05004AMDRLM, 2020 WL 42841, at \*7 (E.D.N.Y. 2020) (dismissing complaint where plaintiff provided no information "that would allow the court to compare the qualifications of the plaintiff with those of the person promoted").

Nor does Plaintiff's allegation that Gagliardi benefitted from "family links" salvage her claim. Even if true, favoritism, nepotism, or cronyism—without more—does not violate federal anti-discrimination law. *Rowe v. New York State Dep't of Tax'n & Fin.*, 786 F. App'x 302, 305 (2d Cir. 2019) (finding allegations of nepotism alone insufficient raise an inference of discrimination); *Barrella v. Village of Freeport*, 814 F.3d 594, 613 (2d Cir. 2016) (explaining that favoritism is not actionable absent discriminatory animus). To the contrary, alleging non-discriminatory favoritism affirmatively weakens Plaintiff's theory by offering an alternative explanation for the promotion decision that is unrelated to gender.

Plaintiff's civil service examination results further undermine any inference of discriminatory intent. As the Court previously observed, the examination results show that Gagliardi scored higher than Plaintiff and that Plaintiff ranked lowest among the three eligible candidates. *See Ferreira v. Dosin*, No. 23-CV-10336, 2024 WL 4894276, at *5 (S.D.N.Y. 2024) (exam results supported conclusion that selected candidate was better qualified). Where a promotion decision is guided by standardized, merit-based criteria—especially objective civil service examination scores—such evidence weighs decisively against an inference that the decision was discriminatory. *See Separ v. County of Nassau*, No. 21-CV-00010, 2021 WL 2474263, at *3 (E.D.N.Y. 2021) (low ranking on promotion list due to lowest examination score undermined discrimination claim).

The examination results further negate Plaintiff's theory because Sergeant O'Sullivan—who is also male—scored highest among the three candidates yet, like Plaintiff, was not promoted. (FAC ¶ 124.) The denial of promotion to a comparator outside Plaintiff's protected class despite superior objective performance strongly undercuts any inference that Plaintiff was denied the promotion because of her gender. *See Ricks v. Conde Nast Publ'ns, Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000) (holding that an inference of discrimination was undermined where both minority and non-minority employees were required to undertake identical performance-improvement measures).

14

Courts routinely hold that where employees outside the plaintiff's protected class are subject to the same adverse employment action, such facts undermine—not support—an inference of discriminatory intent. *See Ricks,* 92 F. Supp. at *347; *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997) (plaintiff's younger co-worker was fired under nearly identical circumstances; thereby, undermining any inference of age discrimination).

Because Plaintiff has failed—despite amendment—to plead facts giving rise to a plausible inference of discriminatory intent in the promotion decision, her failure-to-promote claim cannot proceed and is dismissed without prejudice.

## B.  Section 1983 claims against Defendant Dosin – Disparate Treatment

Plaintiff fails to plead facts plausibly showing that she was not afforded the same employment terms and conditions as her male peers due to her gender.

The legal framework governing Plaintiff's disparate-treatment claim mirrors that applicable to her failure-to-promote claim. *See Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). To state an equal protection disparate-treatment claim, a plaintiff must allege that she was treated differently from similarly situated individuals outside her protected class and that the differential treatment amounted to a materially adverse employment action. *Graham v. Long Island R.R.*, 230 F.3d 34, 39–40 (2d Cir. 2000) (requiring comparators to be similarly situated in all material respects); *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (same). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (*quoting Crady v. Liberty Nat. Bank & Tr. Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)). Allegations of criticism, lack of support, diminished authority, or workplace friction—without more—do not suffice. *Moschetti v. New York City Dep't of Educ.*, No. 15-CV-3161, 2018

15

WL 4759787, at *16-17 (S.D.N.Y. 2018), *aff'd*, 778 F. App'x 65 (2d Cir. 2019) (holding that lack of managerial support and erosion of authority are not adverse actions).

Plaintiff's remaining equal protection claim rests on the assertion that she was denied supervisory support afforded to male sergeants when dealing with insubordinate officers. (FAC ¶¶ 44–114.) As Defendants correctly argue, however, the FAC—like its predecessor—fails to allege facts showing that male sergeants confronting insubordination received support that Plaintiff did not. (Dfts. Mem. at 21–24.) In dismissing the original complaint, the Court expressly noted that although Plaintiff identified instances of insubordination, she did not plead "precise allegations where male supervisors, when confronted with insubordinate officers, received support." *Ferreira v. Village of Hastings-on-Hudson*, 2024 WL 4894276, at *6. The Court further concluded that it could not infer discrimination because "there was no adverse action to begin with." *Id.* at 19.

The FAC largely repleads the previously dismissed allegations, with one asserted addition: On December 10, Sgt. Minor spoke directly with the Chief regarding domestic violence matters; that on September 27, 2023, the Chief met directly with Sgt. O'Sullivan concerning shift swaps; that earlier the same day, P.O. King met with the Chief about accreditation standards; and that the prior day, P.O. Rojas met with the Chief regarding rifle qualifications. (FAC ¶ 88.) These allegations do not concern supervisory responses to insubordination—the theory on which Plaintiff's disparate-treatment claim rests—but instead involve routine administrative, operational, or subject-matter discussions unrelated to discipline, authority, or the management of subordinate misconduct. As such, they do not bear on whether Plaintiff was denied supervisory support when confronting insubordinate officers and therefore do not advance her disparate-treatment theory.

Nor do the individuals identified qualify as appropriate comparators. P.O.s King and Rojas are patrol officers rather than supervisors and thus are not similarly situated to Plaintiff in rank or responsibilities. (Dfts. Mem. at 17–19); *Graham,* 230 F.3d at *39. Sgt. Minor, notwithstanding her

16

designation in the FAC, is alleged to be functioning as a patrol officer and is herself female, which independently forecloses any inference that Plaintiff was treated less favorably on the basis of gender. (Dfts. Mem. at 17–18.) And even assuming Sgt. O'Sullivan is considered a male supervisor, the FAC does not allege that he sought or received supervisory support in response to insubordination under circumstances comparable to those faced by Plaintiff. (*Id*. at 18–19.)

Independently, Plaintiff has not plausibly alleged a materially adverse employment action. Courts in this Circuit have consistently held that a lack of supervisory support, standing alone, does not constitute an adverse employment action under Section 1983. *Moschetti*, 2018 WL 4759787, at *18, n.22 ("Plaintiff was not penalized in pay, rank, or responsibility for her adverse employment reviews; thus her claim of lack of 'support' similarly fails"); *Davies v. N.Y.C. Dep't of Educ.*, 563 F. App'x 818, 820 (2d Cir. 2014) (holding that reassignment and failure to respond to complaints do not amount to materially adverse actions); *Harris v. Long Island Developmental Ctr*., No. 91 CIV. 4658, 1994 WL 445625, at *3 (S.D.N.Y. 1994) ("[L]ack of support, in and of itself, does not comprise discrimination"). Here, the FAC does not allege that Plaintiff suffered any reduction in pay, rank, benefits, or formal job responsibilities, nor does it identify any official policy or custom reflecting gender-based discrimination. Instead, Plaintiff's allegations challenge discretionary supervisory decisions and interpersonal management disputes—such as how and when supervisors chose to intervene in workplace conflicts—which, even if perceived as unfair or frustrating, do not rise to the level of constitutional violations actionable under § 1983. *Bishop v. Wood*, 426 U.S. 341, 349 (1976) (noting that not every employment dispute implicates constitutional protections).

Accordingly, because Plaintiff has failed to plausibly allege either a materially adverse employment action or differential treatment of similarly situated male supervisors, her disparate-treatment claim fails as a matter of law and is dismissed without prejudice.

## C. Section 1983 claims against Defendant Dosin – Retaliation

17

Plaintiff fails to plausibly allege that post-litigation changes to overtime or shift assignments were retaliatory or materially adverse. The temporal gaps alleged defeat any inference of causation, and the challenged measures reflect neutral, uniformly applied policies rather than retaliatory conduct.

To state a retaliation claim, a plaintiff must plausibly allege that: (1) she engaged in protected activity; (2) the defendant was aware of that activity; (3) she suffered a materially adverse employment action; and (4) there is a causal connection between the protected activity and the adverse action. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). When causation is based on temporal proximity alone, courts in this Circuit consistently hold that gaps of more than two to three months are insufficient to support an inference of retaliatory intent. *Kim v. Goldberg*, 862 F. Supp. 2d 311, 319 (S.D.N.Y. 2012) (four-month gap insufficient between protected activity and termination preventing a finding of causation based upon proximity; *Williams v. City of New York,* No. 11 CIV. 9679 CM, 2012 WL 3245448, at *11 (S.D.N.Y. 2012) (two to three months sufficient to negate causation absent other indicia).

Here, Plaintiff filed this action on November 27, 2023. (*See generally* Compl.) Her retaliation claim rests on two subsequent events: (1) a March 22, 2024 departmental order addressing virtual training, issued approximately four months later ("March 2024 Order"); and (2) a collectively bargained shift-swap agreement executed in October 2024, nearly eleven months after the filing of the Complaint. (FAC ¶¶ 139–155.) These intervals, standing alone, are too attenuated to support a plausible inference of causation. *See, e.g.*, *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) (holding that three months is "on the outer edge" of temporal proximity and that a six-month gap is insufficient to support an inference of retaliatory causation); *Brown v. City of New York*, 622 F. App'x 19, 20 (2d Cir. 2015) (intervals of two months to several years "were simply too attenuated to establish that the alleged adverse employment actions were the product of a retaliatory motive absent other supporting factual allegations"); *Kim*, 862 F. Supp. 2d at *319.  Accordingly,

18

without nonconclusory allegations of retaliatory animus or intervening conduct, temporal proximity alone cannot support a plausible inference of causation.

In any event, the challenged measures consist of facially neutral, uniformly applied workplace policies, which are not retaliatory simply because Plaintiff experienced their effects. *Pilman v. New York City Hous. Auth.*, No. 94 CIV 7655, 2000 WL 236322, at \*5 (S.D.N.Y. 2000) (Title VII does not restrict employer discretion where a policy is applied equally); *Platt v. Inc. Vill. of Southampton*, 391 F. App'x 62, 64 (2d Cir. 2010) (affirming dismissal where additional reporting requirements, "while certainly an added inconvenience," did not constitute a materially adverse employment action). The March 2024 Order does not prohibit virtual training; it applies only to downloadable modules and expressly permits officers to complete such training during regular work hours. (Dfts. Mem. at 20–21.) The policy applies across the Department and does not single Plaintiff out for adverse treatment. Likewise, the October 2024 tour-swap agreement extends to sergeants the same rotational framework previously applicable to patrol officers, permits officers of equal rank to retain their assignments by agreement, and reflects a collectively bargained modification rather than unilateral discipline. *Id*. Plaintiff's assertion that these measures were adopted "to punish her" is conclusory and unsupported by allegations suggesting retaliatory design or unequal application. *See Kiernan v. Town of Southampton*, 734 F. App'x 37, 45 (2d Cir. 2018) (rejecting claim where plaintiff alleged, he was uniquely affected but policy was neutral and evenly applied).

Finally, even assuming Plaintiff experienced inconvenience as a result of these measures, such effects do not constitute materially adverse employment actions. Courts have repeatedly held that added administrative burdens, scheduling changes, or policy-driven requirements—when imposed uniformly—do not support retaliation claims. *Platt*, 391 F. App'x at 64; *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.,* No. 05 CIV. 5109, 2007 WL 1149979, at \*16 (S.D.N.Y. 2007) (finding no inference of retaliatory intent where plaintiff failed to demonstrate differential treatment compared to similarly

19

situated employees), *aff'd*, 303 F. App'x 943 (2d Cir. 2008); *Johnson v. Maximus Servs. LLC*, No. 22-CV-2935, 2023 WL 5612826, at *3 (E.D.N.Y. 2023), (finding that a neutral policy, applied equally to all employees, cannot be considered discriminatory under the ADA).

Because Plaintiff fails to allege facts plausibly supporting causation or retaliatory intent—and because the challenged actions reflect neutral, evenly applied workplace policies—her retaliation claim does not cross the line from conceivable to plausible and is therefore dismissed without prejudice.

### D.  Village of Hastings-on-Hudson — Municipal Liability

In order to establish the liability of a municipality under Section 1983 for unconstitutional acts by its employees, a plaintiff must show that the violation of her constitutional rights resulted from a municipal custom or policy. *Powell v. Gardner*, 891 F.2d 1039, 1045 (2d Cir. 1989). A properly pled *Monell* claim establishes a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Barrett v. City of Newburgh*, 720 F. App'x 29, 31 (2d Cir. 2017) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A plaintiff must "allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Isaac v. City of New York*, No. 17 Civ. 1021, 2018 WL 1322196, at *6 (S.D.N.Y. Mar. 13, 2018) (quotations and citations omitted). Otherwise, "Congress did not intend municipalities to be held liable [under Section 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 691 (1978).

Here, the FAC does not identify any formal policy, decision by a final policymaker, or widespread and persistent practice attributable to the Village, but instead relies on conclusory assertions and isolated employment decisions insufficient to state a *Monell* claim. Because the Court has determined that Plaintiff has not plausibly alleged any underlying constitutional violation—including her claims for gender discrimination, disparate treatment, or retaliation—the Village cannot, as a matter of law, be held liable under *Monell*. Any claim against the Village is therefore dismissed without prejudice. *See Bowen v. County of Westchester*, 706 F. Supp. 2d 475, 486 (S.D.N.Y. 2010) (holding that a municipality cannot be held "accountable for a constitutional violation under § 1983 unless [plaintiffs] demonstrate[d] that [municipal] employees deprived them of a federal constitutional or statutory right").

### E.  Leave to Amend

"Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citations omitted).  When exercising this discretion, courts consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility. *Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, the Court will grant Plaintiff leave to file a second amended complaint as to those claims dismissed without prejudice.  Notwithstanding the above explained deficiencies, Plaintiff could potentially plead facts that cure her first amended complaint's various defects.  Although Plaintiff certainly has high hurdles to overcome, leave to amend in this case would not necessarily be futile at this juncture.  Furthermore, as this case is still in its infancy, there would be minimal prejudice to Defendants in permitting Plaintiff to amend.

## CONCLUSION

For the foregoing reasons, Defendant David Dosin's and the Village of Hastings-on-Hudson's Motion to Dismiss is GRANTED. Plaintiff Ferreira's Section 1983 claims against Defendant Dosin for failure to promote, disparate treatment, and retaliation are dismissed without prejudice. Plaintiff's claims against the Village of Hastings-on-Hudson are similarly dismissed without prejudice.

However, the Court grants Plaintiff leave to file a second amended complaint in accordance with this Order as to all her claims. Plaintiff is advised that the second amended complaint will replace, rather than supplement, the first amended complaint. Therefore, any claims Plaintiff wishes to pursue must be included in the second amended complaint. Should Plaintiff choose to file a second amended complaint, it must be filed no later than January 27, 2026. If Plaintiff files a second amended complaint, Defendants are directed to respond to the second amended pleading by February 17, 2026. Should Plaintiff fail to timely file the second amended complaint, the claims dismissed without prejudice shall be deemed dismissed with prejudice.

The Clerk of Court is directed to terminate the action and the motion at ECF No. 28.

SO ORDERED.

Dated: January 5, 2026
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge